John T. LEMILY et al.,

v.

The **UNITED STATES.**

No. 44–60.

United States Court of Claims.

Dec. 12, 1969.

Rufus W. Peckham, Jr., Washington, D. C., for plaintiffs. Carl L. Shipley, Washington, D. C., attorney of record; Shipley, Akerman & Pickett, Washington, D. C., of counsel.

Allen Van Emmerik, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

OPINION

PER CURIAM:

This case was referred to Trial Commissioner George Willi with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on March 13, 1969. Exceptions to the commissioner's findings, opinion and recommended conclusion of law were filed by plaintiff. Defendant elected to submit the case on the commissioner's report without exceptions or brief. The case has been submitted to the court on oral argument of counsel. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law with a minor modification, it hereby adopts the same, as modified, as the basis for its judgments in this case. Therefore, plaintiffs

are not entitled to recover and the petition is dismissed.

Commissioner Willi's opinion, as modified by the court, is as follows:

Plaintiffs in this case are civilian employees who served as relief deck officers and relief engineers in the ports of Seattle and New York for the Military Sea Transportation Service (hereinafter referred to as MSTS) of the Navy Department during the period in suit, February 10, 1954 to August 16, 1958. They were hired as temporary employees and paid at an hourly rate on a when-actually-employed basis. When on duty their work was to stand evening, weekend, and holiday watches in place of the officers on MSTS ships that were in port.

The sole question is whether plaintiffs' employment by MSTS prior to August 16, 1958 entitled them to the annual and sick leave benefits accorded government employees generally. Since that date they have been credited with leave.

The relevant statutory provisions are contained in the Annual and Sick Leave Act of 1951, 65 Stat. 679. Section 202 of that Act enumerates various categories of employees excluded from its general coverage. Among those exclusions is the following: [1]

* * * part-time officers and employees (except hourly employees in the field service of the Post Office Department) for whom there has not been established a regular tour of duty during each administrative workweek. * * *

The defendant relies on the above provision, as applied to the MSTS relief officer employment procedures used until August 16, 1958, as barring plaintiffs from the leave for which they sue. Defendant's position is that plaintiffs were part-time employees whose compensable labor was not performed within an established and regular tour of duty as envisioned by the statute.

Plaintiffs advance four arguments, one general and three specific, in support of their claims.

They contend, generally, that since the 1951 Act is concerned with matters of respite from labor and mitigation of the economic consequences of illness, its coverage should, as a matter of policy, be liberally construed to embrace all civil service employees unless clearly excepted.

Plaintiffs' specific contentions are (1) that to the extent that they actually worked the equivalent of 40 hours a week on an annual basis, they were full-time employees and therefore not the "part-time" employees described in the exclusionary provision, quoted above; (2) that denial of leave prior to August 16, 1958, was wrongful because MSTS could theretofore have instituted its current employment procedures as readily as it did thereafter; and (3) that, in any event, those relief officers employed by MSTS' Pacific Area were entitled to leave because, even if deemed "part-time" employees, there had been established for them "a regular tour of duty during each administrative workweek."

The nature of the arguments urged is such that a reasonably complete recitation of the facts is necessary to an adequate evaluation of the claims and an understanding of the conclusions reached herein.

Most of the plaintiffs in this action served as relief officers in the Atlantic Area of MSTS which covered New York harbor. The remainder were employed at Seattle by the Pacific Area. The Pacific Area has long-since been disestablished with the consequent destruction or loss of records and dispersion of supervisory personnel. At their election, no plaintiffs employed by that Area testified in this case. Accordingly, the factual situation applicable to the Pacific Area is based on such scant records as the parties were able to locate, augmented by the testimony of an Industrial Relations Officer stationed at the Wash-

---

1. 5 U.S.C. § 2061(b) (1) (B) (1964 Ed.); now 5 U.S.C. § 6301(2) (B) (ii).

ington, D.C. headquarters of MSTS during approximately the last half of the period in suit.

Unlike the men in the Atlantic Area, who were essentially land-based, the relief officers in the Pacific Area regularly went to sea on MSTS ships and served as relief officers only during intermittent periods ashore between seagoing assignments. Actual work assignment procedures, however, did not materially differ as between the two Areas.

In the Pacific Area, weekly advance listings of vessels scheduled to be in port and requiring relief officers were drawn up. These listings, which were subject to revision because of unanticipated and unscheduled ship movements, showed only the projected potential for future employment of relief officers. They did not purport to assign particular men to any of the listed ships. Notification of work assignments was usually by telephone, generally 7 to 72 hours in advance of duty for deck officers, and 4 to 8 hours for engineers. On the strength of the vessel listings, the Pacific Area MSTS Command, beginning April 24, 1954, credited its relief officers with annual and sick leave on the basis of all hours for which they received pay. A General Accounting Office audit resulted in an October 11, 1954 letter from GAO advising the Command that the weekly vessel listings, which in terms did not effect work assignments as to any specific relief officers, did not constitute the establishment of "a regular tour of duty during each administrative workweek" within the meaning of Section 202 of the Annual and Sick Leave Act of 1951, *supra*. The Pacific Area Command thereupon cancelled all accrued but unused leave and recovered the pay involved for the leave that had been used. No new or different employment procedures were thereafter instituted by the Pacific Area Command and no more leave was credited to the relief officers employed by it.

In the Atlantic Area, prior to August 16, 1958, the matter of work assignments for relief officers was altogether handled orally by a dispatcher who testified at length at the trial.

During the period in suit, MSTS ship traffic in the New York harbor was materially heavier than it has been since. Thus, whereas the relief officer program now functions there with 25 deck officers and 37 engineers, it then had approximately 50 of each type.

As previously noted, the Atlantic Area plaintiffs were men of seafaring background who, for various reasons, had determined to remain ashore. For approximately 65 percent of them, relief officer duty represented their sole source of employment and income. The remainder held various regular jobs ashore, the hours of which did not conflict with at least some of the established relief officer watch periods at night or on weekends and holidays.

There was an unwritten but established policy in the Atlantic Area Command under which any regular seagoing deck and engineering officers of MSTS who happened to be in port and desired supplementary relief officer duty were given the first opportunity to fill available assignments. Duty by such persons did not bulk large in the Atlantic Area's relief officer program, however, and none of them are plaintiffs in this case.

Within the category of essentially land-based officers with which we are here concerned, the Atlantic Area dispatcher evolved and applied his own system of priority in making duty assignments. Under this system he gave preference to the men that he knew relied on relief officer work as their sole source of income. As noted, this group represented approximately 65 percent of the total force. The dispatcher attempted to equalize the available work among these men so that each had the opportunity of being paid for approximately 35–40 hours per week. The remainder of the force, consisting of the men to whom relief officer duty represented a source of income supplementing that from their regular jobs, were used mainly as fill-ins on a rotating basis so that there was a

general equivalence among them in MSTS earnings.

All of the information utilized by the dispatcher in classifying the men, as above described, was based on his informal personal contacts with them.

The basic source of information that he used, both before and after August 1958, in making duty assignments was a sheet regularly furnished him by the Atlantic Area's operations office showing the present location and projected port arrival and departure times of all MSTS ships using the New York harbor.

The dispatcher's working file on the men consisted of a series of cards showing the name, telephone number, capability (deck officer or engineer), and duty-hour availability of each of them.

As a matter of routine, the men who desired to work regularly as relief officers contacted the dispatcher by telephone every second or third day. The others did so less frequently. When the men called, the dispatcher advised them of the likelihood of upcoming assignments based (1) on the arrival and departure data shown on the vessel sheets and (2) on the rotational consideration of how recently the man in question had received a duty assignment.

All duty assignments were made by the dispatcher in a telephone call to the man assigned. In the usual case, this was done 3 or 4 days in advance of the assigned duty. In approximately 10 percent of the instances, the assignments were made on shorter notice, sometimes just a matter of a few hours. These were emergency situations occasioned by the unscheduled movement of a ship or by the unforeseen inability of a man to meet an assignment previously given him.

Each day the dispatcher prepared an information sheet for the MSTS duty officer for the New York harbor. The list included three categories of information. First, there was a list of the MSTS ships to which relief officers had been assigned for that evening. Opposite each ship were listed the names and assigned watch periods of the two relief deck officers and engineers who were to be on duty. Second, was a so-called availability list. This was a list of the names, capabilities, and telephone numbers of all relief officers who had not been assigned for that evening but who the dispatcher believed would be available on call in case one of the assigned officers did not report for duty or became indisposed while on duty. Finally, the duty officer was given a roster of all relief officers employed by the Atlantic Area of MSTS.

The plaintiffs, who were paid on an hourly basis only for time actually worked, assumed no formal commitment of availability for duty assignments tendered them, on either an advance or emergency basis. Accordingly, their obligations in this regard became defined by the judgment and discretion of the dispatcher and by their individual consciences and desire to earn pay. In practice, a man was not required to fill a duty assignment offered him in advance or to have his name included on the availability list for a particular day if he had a reasonable excuse and was not simply malingering. In those infrequent instances where the dispatcher was not satisfied with a man's proffered excuse, the sanction most usually applied was simply the withholding of duty assignments for a period of time. There were isolated cases, however, where the offender was brought up on formal disciplinary charges.

In January 1958, an attorney, retained by the Atlantic Area plaintiffs, contacted the MSTS authorities in Washington contending that his clients were entitled to earn annual and sick leave. An exchange of correspondence ensued with the MSTS adhering to the position that the plaintiffs were ineligible for leave benefits because they were part-time employees for whom there had not been established a regular tour of duty during each administrative workweek as envisioned by Sec. 202(b) (1) (B) of the 1951 Act, *supra*. Thereafter, plaintiffs filed a claim for leave with the GAO,

and the Comptroller General denied that claim. Accordingly, there is no question as to plaintiffs' exhaustion of administrative remedies.

On August 5, 1958, the MSTS Atlantic Area issued a regulation-type staff notice announcing a duty scheduling program by virtue of which relief officers would henceforth be eligible to earn annual and sick leave for those working periods that had been scheduled in advance. Under the new program, deemed by defendant to satisfy the "established tour of duty" standard of Sec. 202(b)(1) (B) of the 1951 Act, all employment and actual work assignment procedures previously used have remained the same. The only change initiated in 1958 and continued thereafter is the addition of a form notice issued individual relief officers approximately 1 month in advance. The notice simply advises the officer that, subject to change for unforeseen ship movements and any other events beyond the control of management, he will be expected to serve certain specified watches on stated dates. The notice does not refer to or identify any ships. Actual duty assignments to particular ships are still made via telephone by the dispatcher 3 or 4 days in advance. Data appearing on the same type of vessel sheet always used by the dispatcher is the basis for the tentative work periods scheduled in advance. The predictability of vessel arrivals and departures has been no greater since 1958 than it was before. The percentage of completion of telephone assignments to specific duty has been essentially the same since initiation of the prescheduling program as it was before. The probabilities of available relief officer work in the future were greater in the Atlantic Area before 1958 than they have been since, because of a greater volume of MSTS ship traffic in the earlier period.

Under the prescheduling system in use since August 1958, relief officers are only credited with leave for those hours worked within the periods specified in the preschedule notices, except to the extent that such periods are varied by management. Earned leave may only be taken during the periods for which a relief officer has been prescheduled.

■ For the reasons that follow, the pre-1958 factual situation as outlined above does not qualify the plaintiffs for leave benefits under the 1951 Act.

Even if the aims and subject matter of the Annual and Sick Leave Act of 1951 are deemed sufficient to make a liberal construction of its terms appropriate,[2] an examination of the legislation's background and development convincingly demonstrates that before 1958 plaintiffs were plainly not within its intended coverage and suggests that the fullest measure of interpretative liberality must be applied to accord them coverage thereafter.

By an Act of March 15, 1898, in conjunction with the establishment of a 7-hour day, 6-day week for all employees of the Executive Departments, Congress authorized department heads to grant up to 30 days' leave with pay, per year, to their employees, provided that such period might be enlarged up to an additional 30 days in the event of serious illness. Ch. 68, 30 Stat. 277, 316–317.

The matter of leave remained governed by the above provisions until modified in the Economy Act of June 30, 1932, ch. 314, 47 Stat. 382, 407. Section 215 of that Act reduced allowable annual leave to a maximum of 15 days per year and vested the President with authority to prescribe sick leave privileges by regulation.

By an Act of March 14, 1936, ch. 140, 49 Stat. 1161, Congress provided 26 days of annual leave for essentially all gov-

2. As, for example, in the case of Workmen's Compensation, Friend v. Britton, 95 U.S.App.D.C. 139, 220 F.2d 820–821 (1955), cert. denied, Harry Alexander Inc. v. Friend, 350 U.S. 836, 76 S.Ct. 72, 100 L.Ed. 745 and Social Security, Ewing v. Black, 172 F.2d 331, 335, 6 A.L.R.2d 948 (6th Cir. 1949).

ernment employees, except those in the postal service, irrespective of their years of service. Existing sick leave provisions were left intact.

In 1942, as a national emergency measure, the ceiling of accumulation of unused annual leave was increased from 60 to 90 days. Ch. 737, 56 Stat. 1052.

The progenitor of the part-time employee provision contained in Sec. 202(b) (1) (B) of the Annual and Sick Leave Act of 1951 originated in an Act of October 5, 1949, ch. 598, 63 Stat. 703, which provided:

That part-time officers and employees for whom there has been established a regular tour of duty covering not less than five days in any administrative workweek shall unless otherwise excepted, be entitled to the benefits pro rata of the annual and sick leave Acts of March 14, 1936 (49 Stat. 1161 and 1162, respectively), and such Acts are hereby amended accordingly.

\*   \*   \*   \*   \*   \*

The Committee Reports and floor debate on this legislation, H.R. 2619, 81st Cong., 1st Sess., clearly reveal Congress' understanding and purpose in providing leave eligibility for part-time employees.

The following statements appear in both the House and Senate Reports (H. Rep.No.655, S.Rep.No.971; U.S.Code Cong.Serv., pp. 1972–74 (1949, Vol. 2)):

This situation was brought to the attention of Congress last year when it was discovered that the Library of Congress had for several years granted pro rata sick- and annual-leave benefits to part-time employees. Several of these employees, who were charwomen, left the Library of Congress and upon their separation had received lump-sum amounts equal to their accrued annual leave. On May 21, 1948, the General Accounting Office raised a question as to these payments for accrued annual leave to part-time employees upon their separation and directed the Librarian of Congress to decisions of the Comptroller General (18 Comp.Gen. 457 and

1001; 21 id. 644; 25 id. 796; and B–38084, November 16, 1943), which held that only full-time employees were entitled to annual- and sick-leave benefits under the Annual and Sick Leave Acts of March 14, 1936.

\*   \*   \*   \*   \*   \*

The bill would extend the benefits of the Annual and Sick Leave Acts on a pro rata basis to all part-time Federal employees for whom there has been established a regular tour of duty covering not less than 5 days in any administrative workweek. For example, an employee regularly working a 3-hour day, Monday through Friday, would be given twenty-six 3-hour days of annual leave a year, and one and one-fourth 3-hour days of sick leave a month. Also, employees who work a varying number of hours each day but *are required to work* some portion of at least 5 days each week would be granted a proportionate amount of leave under the provisions of the bill. [Emphasis added.]

\*   \*   \*   \*   \*   \*

The committee believes that the benefits provided for by this legislation are desirable. *The policy of Congress in granting annual leave to Federal employees is based upon the necessity of giving employees vacations during which they are not compelled to face the routine of reporting regularly to work each day and have the continuing responsibility of performing their duties without rest.* The committee sees no valid reason why part-time employees who work regularly each day for 5 days each workweek should not have a proportionate share of annual and sick leave to which full-time employees are entitled. [Emphasis added.]

The floor debates preceding House and Senate passage of the legislation reflected understanding and endorsement of the views expressed in the Committee Reports, *supra.* 95 Cong.Rec. (Part 7) 8767–68; 95 Cong.Rec. (Part 10) 13318.

In summary, there can be no question as to the type of part-time employee who was eligible for leave benefits under the law as it stood prior to the Leave Act of 1951. Clearly, employees such as plaintiffs did not qualify.

In interpreting and applying the Annual and Sick Leave Act of 1951, ch. 631, 65 Stat. 672, 679, a recognition of the background from which it emerged is instructive. A fundamental consideration to be noted is that the legislation was proposed as an economy measure, not as an effort to generally liberalize fringe benefits for government employees.

Marshaling the relevant legislative history is complicated by the measure's unusual evolution.

The Act originated as S. 1046 (82d Cong., 1st Sess.). Examination of the Senate Report on the bill[3] discloses that, as reported, it was altogether concerned with postal rates, containing no reference to the subject of leave. It is found that what was to become the Leave Act of 1951 was added to the Senate bill as Title II by a floor amendment. 97 Cong.Rec. (Part 8) 11011–11013. The debate accompanying adoption of the amendment is not instructive because its proponent, Senator Johnston of South Carolina, explained that there was no real need for expositive discourse in that the Senate had already considered and passed the same measure. Though not specifically identified in this portion of Sentate debate, the earlier Senate bill referred to was S. 832, 82d Cong., 1st Sess. As revealed by the Report of the Senate Post Office and Civil Service Committee (S.Rep.No.546) the basic aims of S. 832 were to establish a graduated system of annual leave benefits based on years of service and to achieve maximum uniformity of application throughout the Government. Among the exclusions from coverage, as contained in the bill as reported by the Committee, was "part-time officers and employees for whom there has not been established

a regular tour of duty covering at least 5 days in any administrative workweek." 97 Cong.Rec. (Part 6) p. 8253. The identical provision was retained in the Johnston floor amendment added to S. 1046, as previously noted. 97 Cong.Rec. (Part 8) 11011.

The floor debates on S. 832 reveal the real impetus behind passage of some type of general leave legislation. It was the persistent, and ultimately successful, effort of Senator Douglas of Illinois to secure Senate adoption of a rider to the then-current Independent Offices Appropriation bill providing that no employee could take more than 20 days' annual leave per year. 97 Cong.Rec. (Part 5) 6480–86; 97 Cong.Rec. (Part 6) 8268–79. The Douglas amendment was, of course, offered as an economy measure and, significantly, S. 832 was supported as achieving even greater economy than that resulting from the Douglas appropriations rider, 97 Cong.Rec. (Part 6) 8273.

While the Senate was considering S. 1046, the House passed a comprehensive postal rate bill, H.R. 2982, that contained no provisions dealing with leave. 97 Cong.Rec. (Part 2) 1704; 97 Cong. Rec. (Part 9) 11554–71, 11655–85. Immediately after passing H.R. 2982, the House took up S. 1046 and passed it after amending it to strike everything after the enacting clause and substituting the provision of H.R. 2982. 97 Cong.Rec. (Part 9) 11685–91. Thus, at that point, S. 1046, as passed by the Senate, included a Title II dealing with annual and sick leave whereas, as passed by the House, it dealt only with postal rates and such provisions were those of H.R. 2982 rather than those passed by the Senate as Title I of S. 1046. The Senate refused to accept the House amendments and conferees were appointed. 97 Cong.Rec. (Part 9) 11703–05.

The Conference Report (H.Rep.No. 1210) was submitted to both the House and Senate and was accepted without change. 97 Cong.Rec. (Part 10) 13524–

---

3. S.Rep. No. 694, 1951–2, U.S.Code Cong. News, p. 2489.

25, 13581–89. The Conference reinstated Title II of S. 1046 essentially intact. The Conference Report gives no indication of disagreement respecting any of the provisions of Title II as it had passed the Senate or any intended changes of those provisions. Nonetheless, as the bill emerged from the Conference Committee, Section 202(b) (1) (B) provided:

> * * * part-time officers and employees (except hourly employees in the field service of the Post Office Department) for whom there has not been established a regular tour of duty during each administrative workweek. * * *

The above contrasts with the 1949 amendment to the Leave Act of March 14, 1936, *supra*, and Section 202(b) (1) (B) of S. 1046, as it originally passed the Senate, both of which denied leave coverage to:

> * * * part-time officers and employees for whom there has not been established a regular tour of duty covering at least 5 days in any administrative workweek.

Thus, it is seen that on its face the part-time employee leave-exclusion provision of the Annual and Sick Leave Act of 1951 represents a reenactment of prior law except for the elimination, for reasons undisclosed, of the 5-day ingredient in the definition of a tour of duty. There is no evidence of a legislative intent to otherwise alter or relax the basic concept of a tour of duty as representing a specific period of time, regularly established in advance, during which an employee is unequivocally required to work. In short, except for the direct effect of eliminating the 5-day feature, there is no legitimate basis to impute to Congress a more liberal leave policy towards part-time employees under the 1951 Act than it specifically announced in 1949 when it first accorded leave to that group by amending the Leave Act of March 14, 1936, *supra*. This is especially so when it is recognized that, as previously noted, the 1951 Act was regarded as an economy measure whose stated purpose was to narrow, not liberalize, leave privileges generally.

The part-time employee leave regulations of the Civil Service Commission, in prescribing that a tour of duty may consist of as little as a specified work period during only one day of a workweek, have interpreted Section 202(b) (1) (B) of the 1951 Act in the most liberal light permissible. 5 C.F.R. § 30.501 (Rev. as of Jan. 1961), 5 C.F.R. § 630.303 (Rev. as of Jan. 1964).

On the essentially uncontroverted facts of this case, it is clear that, whatever may be said of the period thereafter, prior to August 1958, none of plaintiffs' working hours were put in pursuant to "a regular tour of duty during each administrative workweek" as set forth in the 1951 Act. Their relationship with their employer was essentially one of mutual convenience wherein duty assignments resulted from a day-to-day and generally informal alignment of available work with men willing and able to do it.

Plaintiffs' contention that a person who works the annual equivalent of a 40-hour week is, by definition, not a "part-time" employee under the Act, is without merit.

The standard personnel forms (S.F. 50) by which plaintiffs were employed neither guaranteed nor required any particular amount of work. Suffice to say, the forms expressly noted that plaintiffs were only to be paid "when-actually-employed."

The legislative history of the 1951 Act, previously discussed, makes it abundantly clear that the government employee for whom Congress fashioned the generally applicable leave benefits was one who was *required* to regularly put in the standard 40-hour workweek. A "basic workweek" is so defined in the Civil Service Regulations. 5 C.F.R. § 25.211 (Rev. as of Jan. 1961). Thus, the annual and sick leave allowances provided in the 1951 Act are stated in terms of days, or fractions thereof, "for

each full bi-weekly pay period." The regular 40-hour workweek is implicit in that arrangement.

In general, the full-time employee to whom the provisions of the 1951 Act are applicable is one regularly required to put in the standard workweek, not a when-actually-employed employee who happens to work the annual equivalent of a 40-hour week. If there are uncertainties as to this definition as it might apply to any employee, plaintiffs' counsel has not put forward a clear alternative definition that would accord with the statute, legislative history, and regulations, and still cover his clients' claims.

■ The contention that plaintiffs should prevail because on the facts MSTS could have employed "prescheduling" as easily before August 1958, as it did thereafter, is also without merit.

The evidence shows that in 1954 the Pacific Area Command tried to give its relief officers leave benefits but was stopped by the General Accounting Office.

The Atlantic Area plaintiffs made their first formal request at the administrative level for leave in January 1958. The prescheduling procedure was initiated and leave granted beginning in August of the same year.

Accordingly, it cannot be said that MSTS acted arbitrarily in any wrong-headed sense in failing to provide for relief officer leave before it did.

Finally, there is nothing in the Leave Act of 1951 or the MSTS regulations indicating that an agency administrator is required to establish a regular tour of duty for a part-time employee.

Under all of the circumstances, and considering that the prescheduling initiated in August 1958 has produced little, if any, significant impairment in plaintiffs' freedom to refuse work when they want to, it would be altogether inappropriate to award them leave for earlier periods on the extrameritorious consideration that MSTS should be punished for inaction.

■ Lastly, it is contended on behalf of the Pacific Area plaintiffs that even if regarded as "part-time" employees, they are due leave because they served pursuant to "a regular tour of duty during each administrative workweek." Though an incomplete 1956 form was offered in evidence at the trial, it was necessarily ruled inadmissible. A thorough search by counsel for both parties failed to unearth any witness competent to identify or explain the document's completed content, purpose or usage. Counsel were equally unsuccessful in locating any other documentary materials shedding light on the form or filling any of its voids. On its face, the isolated and otherwise unidentified document is so wholly devoid of probative value as to render it meaningless in the context of the issues presented. On the admissible evidence that the parties were able to adduce, it must be concluded that prior to August 1958, the relief officers in the Pacific Area, like those in the Atlantic Area, did not do their work pursuant to an established "regular tour of duty during each administrative workweek" as contemplated by Section 202(b) (1) (B) of the 1951 Leave Act.

Since plaintiffs cannot prevail on any of the theories that they have advanced, their claims must be denied.